# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-1413V**

|  |  |
|---|---|
| IRENE PERKIN, | Chief Special Master Corcoran |
| Petitioner, | Filed: January 12, 2026 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC, for Respondent.*

## ENTITLEMENT DECISION[1]

On September 30, 2022, Irene Perkin filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a Table injury of shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on November 3, 2020. Petition at 1. The case was assigned to the Special Processing Unit.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner has not established by a preponderance of the evidence that she is entitled to compensation. Therefore, the case is properly dismissed.

## I. Factual History

### A. Medical Records

Petitioner received the vaccine alleged as causal in her left arm on November 3, 2020. Ex. 7 at 8. At the time of vaccination, she was 73 years old. Two weeks later (November 19, 2020), she had a telemedicine follow up appointment for sleep apnea. Ex. 5 at 88. The record of that appointment does not mention shoulder pain.

The next day (November 20, 2020), Petitioner saw her primary care physician ("PCP") for a follow up on a hospital visit, sleep apnea, and depression. Ex. 2 at 62. A review of her symptoms was positive for "[a]rthritic manifestations," without further detail, and she was prescribed a medication for her arthritis. *Id.* at 62-64. On examination, a visual overview of all four extremities was "normal," with no further information. *Id.* at 65. Her November 3rd vaccination was noted in her record. *Id.* The record does not include any indication that Petitioner reported any shoulder pain.

The next records are from more than four months later. On April 28 and June 2, 2021, Petitioner followed up with a sleep medicine specialist. Ex. 5 at 75, 80. The records of these appointments do not mention shoulder pain.

On June 24, 2021 – now more than seven months since vaccination - Petitioner was seen in a community care clinic, complaining of "progressively worsening left shoulder pain for the past 6 months." Ex. 5 at 70. She stated that her pain began after receiving a flu vaccine in November 2020, although she did not state how soon after. *Id.* She now had "daily, constant pain" in her left shoulder that was worse at night. *Id.* She rated her pain ten out of ten, but reported that she had full range of motion. *Id.* at 70, 72. On examination, her shoulders exhibited normal range of motion bilaterally. *Id.* at 73. She was assessed with left shoulder pain, which was suspected as being caused by arthritis or tendinopathy. *Id.* She stated that she had an appointment with her PCP the following week, and was given home exercises and advised to use over-the-counter medications for pain. *Id.* at 73-74.

On June 30, 2021, Petitioner saw her PCP for shoulder pain. Ex. 2 at 58, Ex. 10 at 3. There are two records of this visit, an electronic (Ex. 2 at 58) and a handwritten record (Ex. 10 at 3). The history section of the electronic record states "[a]dditional information: see scanned docs for master IM d/t internet outage," suggesting that Petitioner's PCP created a handwritten record of the visit (Exhibit 10 at 3) due to an internet outage, which was later scanned into the electronic record.

The handwritten record of Petitioner's June 30, 2021 PCP appointment states that her chief complaint was left arm pain for six months. Ex. 10 at 3. The pain was getting worse, and Petitioner could not lift her arm and was having difficulty with sleep. *Id.* This record states that she rated her pain five out of ten and complained of left shoulder pain and reduced range of motion. *Id.* On examination, this record states that she exhibited impingement signs, pain with motion, reduced strength, and reduced range of motion. *Id.*

The electronic record of Petitioner's June 30th PCP appointment states that Petitioner had "chronic left shoulder OA [osteoarthritis]" and had noted "worsening and impaired ROM [range of motion] over the last few weeks." Ex. 2 at 60. Petitioner was assessed with impingement syndrome and osteoarthritis of the left shoulder, given medication, and referred for X-rays and physical therapy. *Id.* at 60. The x-ray showed moderate arthrosis involving the left glenohumeral joint, which had worsened since a prior x-ray 13 years prior, mild arthrosis of the left acromioclavicular joint, and osteopenia. Ex. 5 at 69.

Petitioner underwent an occupational therapy ("OT") assessment of her left shoulder on August 9, 2021. Ex. 5 at 174. The record of this assessment lists an onset date of July 13, 2021. *Id.* Petitioner complained of pain and decreased strength and ROM in her left shoulder "which has been worsening over past 6 months." *Id.* Petitioner reported a pain level of five out of ten, explaining that pain limited her ability to perform daily activities. Petitioner attended three additional OT sessions between September and November 2021. *Id.* at 171-73.

A Medicare preventative visit on August 17, 2021 recorded that Petitioner was using medication and attending OT for shoulder osteoarthritis and pain and ROM. Ex. 2 at 46. Three months later (November 10, 2021), Petitioner returned to her PCP for shoulder pain, now stating that her pain began a year earlier and was worsening. *Id.* at 40. The record adds "[p]t here today had flu shot last November 3rd and ever since has had pain in her shoulder, PT is not helping, would like to do something else." *Id.* She was referred to an orthopedist. *Id.* at 43.

Two weeks later (November 24, 2021), Petitioner saw orthopedic nurse practitioner Jaimee Brew for shoulder pain. Ex. 5 at 59. She reported that the pain had been present for "approximately 1 year." *Id.* NP Brew thought Petitioner could have partial tearing of the supraspinatus tendon and/or some rotator cuff tendinosis. *Id.* at 61. Petitioner declined a steroid injection, and was referred for an MRI. *Id.* The MRI showed rotator cuff tendinosis, moderate glenohumeral joint arthrosis, mild acromioclavicular joint arthrosis, and fraying and degeneration of the labrum. *Id.* at 53. Additionally, there was mild edema and fluid in the acromioclavicular joint "likely secondary to arthrosis," and mild subdeltoid fluid. *Id.*

Petitioner saw orthopedist Dr. Shane Woolever on December 28, 2021 to review the MRI. Ex. 5 at 49. Dr. Woolever assessed her with arthritis of the left glenohumeral

joint, noting that she had been suffering with this "for over a year" and it was worsening despite conservative treatment. *Id.* at 52. Thus, Petitioner wished to undergo surgery. *Id.*

Petitioner underwent a left shoulder reverse total shoulder arthroplasty on February 8, 2022. Ex. 5 at 41. The operative report lists both the preoperative and postoperative diagnoses as "[l]eft shoulder severe primary osteoarthritis with ankylosis of the shoulder." *Id.* Petitioner thereafter attended post-operative orthopedic and OT visits. *Id.* at 35; Ex. 6.

Over a year after surgery, on March 24, 2023, Petitioner saw her PCP for knee and left shoulder pain. Ex. 9 at 11. She stated that her surgery "didn't help as much as it should have," and she still had daily pain. *Id.* On examination, her left shoulder ROM was moderately reduced. *Id.* at 14. A shoulder x-ray showed no evidence of acute fracture or dislocation. *Id.* at 35.

### B. Testimonial Evidence

Petitioner filed a declaration dated September 20, 2022 in support of her claim.[3] Ex. 1. She states that she noticed at the time of vaccination that the vaccine was administered higher than usual. *Id.* at ¶ 6. When she woke up the next morning, she had a shooting pain in her left arm, as well as pain when she moved her arm and reduced strength. *Id.* at ¶ 7. Within the first 48 hours after vaccination, she felt "dull numb pain in my left arm and my arm felt heavy." *Id.*

Initially, Petitioner thought the pain would resolve with time - but it worsened. Ex. 1 at ¶¶ 8-9. Petitioner states that she reported her shoulder pain to her PCP at the November 20, 2020 appointment – although the record of that appointment does not so indicate. *Id.* Petitioner also states that she told the physician assistant at the clinic she went to on June 24, 2021 that her pain had been present and started after her November 2020 vaccination. *Id.* at ¶ 10.

Petitioner maintains that she has consistently experienced left shoulder pain and decreased ROM "[s]ince the time the vaccine was administered," but has not sought in-person medical treatment with the urgency or frequency she otherwise would have due to safety concerns associated with the COVID-19 Pandemic. Ex. 1 at ¶ 23. She attempted to alleviate her pain with over-the-counter medication, heat, rest, and stretching. *Id.* Petitioner's declaration does not otherwise address her delay in seeking care or how she is able to recall, nearly two years later, details about her pain and symptoms in the first 48 hours after vaccination.

Petitioner's husband submitted a declaration dated December 6, 2024, in support of her claim. Ex. 11. He states that about 24 hours after Petitioner's at-issue vaccination,

---

[3] Although Petitioner labeled Exhibit 1, as well as Exhibit 12, as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations sworn to under penalty of perjury. 28 U.S.C. § 1746.

she complained of left shoulder pain. *Id.* at ¶ 4. Over the course of the next several weeks, he states that her pain did not subside. *Id.* He states that he has a "good recollection of Petitioner's condition in the several weeks after the vaccine" and that it was evident that she was in a lot of pain. *Id.* at ¶ 6. He states that he recalls Petitioner going to the hospital late at night on November 10, 2020 due to her left shoulder pain – although Petitioner has not identified a record documenting that alleged visit. *Id.* He adds that she remained in pain "[f]or the rest of 2020 following her vaccination and for the entirety of 2021." *Id.* at ¶ 8.

## II. The Parties' Arguments

Respondent argues that Petitioner has not preponderantly proven that her pain occurred within 48 hours, as required for a Table SIRVA claim. Respondent's Rule 4(c) Report, filed July 2, 2024, at *13 (ECF No. 33) ("Resp."). Respondent notes that Petitioner first sought medical care for her alleged injury seven months after vaccination.[4] Resp. at *13. During her treatment, she described her pain as worsening over the preceding few weeks (Ex. 2 at 59-60) and having been present for the past six months (Ex. 5 at 70). *Id.* When she did relate her pain to vaccination, she vaguely stated that it started "after," which is not specific enough to place onset within 48 hours of vaccination. *Id.*

Although Petitioner's declaration asserts that her pain began the morning after vaccination, Respondent asserts that contemporaneous medical records do not support that assertion. Resp. at *14. And the "lengthy delay between vaccination and first report to a provider tends to undermine any claim of a sudden onset of pain with vaccination"; instead, Respondent views the facts as suggesting a gradual deterioration of Petitioner's shoulder, consistent with worsening arthritis. *Id.* And her treaters "overwhelmingly attributed her left shoulder pain and dysfunction to osteoarthritis," with no providers diagnosing her with SIRVA or attributing her pain to vaccination. *Id.* at *14, 16.

In addition, Petitioner states that she delayed seeking care due to the Pandemic, but Respondent points out that she had multiple medical visits for other issues during the time between vaccination and her first care for shoulder pain – undermining her claim. Resp. at *14. Additionally, Respondent notes that Petitioner experienced pain in her neck associated with shoulder pain, preventing her from establishing that her pain was limited to the shoulder in which the vaccine was administered. *Id.*

Petitioner asserts that her shoulder pain began on November 4, 2020, the day after vaccination. Petitioner's Response to Order to Show Cause, filed Dec. 19, 2024, at *12

---

[4] Respondent asserts that Petitioner's first care occurred on June 3, 2021, citing Ex. 2 at 60 – which is a record of Petitioner's June 30, 2021 PCP visit. Petitioner's first care actually occurred on June 24, 2020, and at this visit she *did* relate her pain to vaccination – although because she stated her pain had been ongoing for six months, this would literally place onset in December 2020, well over 48 hours after vaccination.

(ECF No. 38) ("Pet."). She emphasizes that it is not unusual for a SIRVA petitioner to expect their pain to resolve on its own and delay seeking care. Pet. at *12. Petitioner contends that medical appointments during the early stages of SIRVA treatment "often omit references to or specific complaints of shoulder pain and the vaccination that caused it," citing *Dempsey v. Sec'y of Health & Human Servs.*, No. 18-0970, 2021 WL 1080563 (Fed. Cl. Spec. Mstr. Feb. 17, 2021) and *Sprigg v. Sec'y of Health & Human Servs.*, No. 21-0523, 2023 WL 9288067 (Fed. Cl. Spec. Mstr. Dec. 11, 2023).

Petitioner states that she "attended limited intervening appointments before beginning treatment for her SIRVA nearly eight months later," and only saw her PCP once during that time, less than 20 days after vaccination. Pet. at *13. Her other appointments were for limited purposes where it would be unexpected to report shoulder pain. *Id.* at *13-14.

Petitioner asserts that her nearly eight-month delay in seeking care is "comparable to other petitioners who established the onset criterion" – although she relies on cases with shorter treatment delays of under six months. Pet. at *14. Petitioner argues that the June 2021 record stating that her condition had worsened over the previous six months "can be fairly interpreted to mean that her symptoms started in November 2020 and have worsened over the last six months." *Id.* And despite the treatment delay, Petitioner asserts that November 2020 is the only recorded date of onset – ignoring the OT records listing an onset date of July 13, 2021 (Ex. 5 at 174). *Id.* at *15.

Petitioner further objects to Respondent's suggestion that her osteoarthritis diagnosis would explain her symptoms. Pet. at *15. It was not her only diagnosis, nor is it the only pathology identified in her MRI. *Id.* Petitioner asserts that the MRI and clinical examination results support a finding that her injury involved acute rotator cuff tendinosis and impingement syndrome, which she asserts more likely explain her symptoms. *Id.* In support, Petitioner cites *Werning v. Sec'y of Health & Human Servs.*, No. 18-267V, 2020 WL 5051154 (Fed. Cl. Spec. Mstr. July 27, 2020), in which I noted that in most SIRVA claims where the claimant undergoes an MRI, there is evidence of degeneration, especially in certain age groups. *Id.* at *16. Petitioner asserts that it is not surprising that a person of her age had osteoarthritis, but because she never had shoulder pain prior to vaccination, it is likely that the sudden onset of her pain is at least partially attributable to tendinosis and impingement syndrome. *Id.* at *16-17.

## III. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical

6

opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

In order to prevail on a causation in fact claim, Petitioner must establish the *Althen* factors. *See Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (setting out a three part test for causation in fact claims, requiring that a petitioner establish (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury).

## Analysis

A careful review of the record leads me to conclude that more likely than not the onset of Petitioner's shoulder pain did not occur within 48 hours of vaccination, or within any timeframe that could reasonably be attributed to vaccination. Therefore, Petitioner cannot prevail on any version of the claim (Table or causation in fact).

The delay in treatment in this case proves to be a significant stumbling block for Petitioner in establishing onset. Although I have frequently noted in other decisions that it is not uncommon for SIRVA petitioners to delay seeking care in hopes that their

condition will resolve on its own,[5] this does not mean that the length between vaccination and their first medical treatment is never relevant or significant.

On the contrary – as a treatment delay becomes longer, the evidence becomes less contemporaneous, weakening a claim, and making it difficult to deem onset allegations reasonable. And what happens *during* the gap is also important – for a claimant who demonstrates a propensity to seek other kinds of treatment, or who forgoes obvious opportunities to inform treaters of issues, is one who would be expected to complain promptly of persistent shoulder pain had it existed. *See Orban v. Sec'y of Health & Human Servs.*, No. 21-0978V, 2024 WL 3205134 (Fed. Cl. Spec. Mstr. May 28, 2024) (petitioner had not shown that the onset of her shoulder pain occurred within 48 hours of vaccination, where she did not seek care until nearly seven months thereafter and, in the interim, underwent a comprehensive physical examination not recording any abnormalities in her joints or muscles); *McCarthy v. Sec'y of Health & Human Servs.*, No. 21-0425V, 2023 WL 9063478 (Fed. Cl. Spec. Mstr. Nov. 29, 2023) (finding onset of shoulder pain was not within 48 hours of vaccination where the petitioner did not seek care until nearly eight months later); *Shoemaker v. Sec'y of Health & Human Servs.*, No. 20-0625V, 2022 WL 2288698 (Fed. Cl. Spec. Mstr. Jan. 18, 2022) (petitioner had not shown that the onset of her pain occurred within 48 hours of vaccination, where she did not seek care until ten months afterward, and finding that the claimant's lack of a PCP was not sufficient to overcome this significant treatment delay), *mot. for. review den'd*, 160 Fed. Cl. 307 (2022).

Here, Petitioner first complained to a treater of shoulder pain nearly *eight* months after vaccination. At that time, she stated that her pain began "soon" after vaccination, but did not state how soon. And she complained of worsening pain for *the prior six months* – suggesting that her pain may have begun over a month after vaccination. Although Petitioner suggests that I interpret this to mean that her pain started immediately after vaccination and worsened thereafter, such a reading is somewhat strained. And her OT record lists the onset of her condition as occurring in July 2021, over eight months after vaccination.

I do not in this case find that the Pandemic justifies some of this delay. Although I have acknowledged that the Pandemic disrupted health care for many people, delays in the timeframe of late 2020 and later, such as in this case, are properly viewed differently from those in the Pandemic's early months. *See Crittenden v. Sec'y of Health & Human Servs.*, No. 21-0215V, 2024 WL 5261958, at *10 (Fed. Cl. Spec. Mstr. Nov. 21, 2024) (acknowledging that the impact of the Pandemic has been taken into account in many

---

[5] *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024); *Amor v. Sec'y of Health & Human Servs.*, 20-0978, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021).

cases, but giving less weight to claimed impacts after the second half of 2020). Additionally, Petitioner's assertion that she delayed care for her shoulder due to the Pandemic is weakened by the fact that she sought care for other concerns *several times* in the interim. In particular, when she saw her PCP just over two weeks after vaccination, it appears that she reported having *received* a flu vaccine that month, but the record contains no indication that she reported continuing shoulder pain from that vaccination. Ex. 2 at 65.

Petitioner's declaration does state that she reported shoulder pain at her November 20, 2020 PCP visit. However, the gap between this appointment and her declaration (nearly two years) remains unrebutted, and it lessens the weight to be given to this alleged pain report. Other testimonial evidence is not sufficient to overcome concerns raised by Petitioner's treatment delay. Although Petitioner and her husband assert that her shoulder pain began the day after vaccination, neither explains how they are able to recall this years later, nor do they adequately explain why she sought care for other concerns but not her shoulder in the following months.

There is also the fact that Petitioner's treating physicians repeatedly attributed her symptoms to osteoarthritis. And her surgeon listed her diagnosis as osteoarthritis *after* having operated on her, which allowed him greater access to view the condition of her shoulder. This alternative explanation evidence makes it even less likely a SIRVA-like claim could succeed even if I only deemed the Table claim deficient. As it is, however, no claim is likely successful on this record, given Petitioner's inability to preponderantly substantiate a close-in-time injury.

## Conclusion

**Petitioner has failed to preponderantly establish that her injury meets the requirements for a Table SIRVA or an off-Table claim. Accordingly, this case is DISMISSED for insufficient evidence. The Clerk of Court shall enter judgment accordingly.**[6]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.